**Affirm and Opinion Filed June 9, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-01525-CV

## D MAGAZINE PARTNERS, L.P. D/B/A D MAGAZINE F/K/A MAGAZINE LIMITED PARTNERS, L.P. AND ALLISON MEDIA, INC., Appellants
## V.
## JANAY BENDER ROSENTHAL, Appellee

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-01346**

## MEMORANDUM OPINION

Before Justices Molberg, Reichek, and Nowell
Opinion by Justice Nowell

D Magazine Partners, L.P. d/b/a D Magazine f/k/a Magazine Limited

Partners, L.P. and Allison Media, Inc. (collectively D Magazine)[1] appeal the trial

court's denial of their motion for summary judgment. *See* TEX. CIV. PRAC. & REM.

CODE § 51.014(a)(6). In two issues, D Magazine argues the trial court erred by

---

[1] "D Magazine" refers to appellants collectively. "*D Magazine*" refers to the magazine publication *D Magazine*.

denying its motion for summary judgment and striking portions of its summary judgment evidence.[2]  We affirm.

FACTUAL BACKGROUND

## A. The Article

In March 2013, *D Magazine* published an article titled "The Park Cities Welfare Queen" under the heading "CRIME" (the Article). [3]  The subheading announced that "[o]ne University Park mom has figured out how to get food stamps while living in the lap of luxury."  Next to the headline is a mug shot of Janay Bender Rosenthal[4] surrounded by a gilded frame.  Beneath the picture, the author wrote: "GLAMOUR SHOT: Janay Bender Rosenthal was arrested for theft in Collin County, where all mug shots are taken with a gray towel wrapped around the perp's neck."  The author is identified as an anonymous Park Cities parent.

After the Article was published, Bender sued D Magazine for defamation.  In response to Bender's lawsuit, D Magazine filed a motion to dismiss pursuant to the Texas Citizens Participation Act (TCPA).  The trial court's order on the TCPA motion was appealed to this Court and then to the Texas Supreme Court, which concluded the trial court properly denied the motion as to Bender's defamation

---

[2] For purposes of resolving this appeal, we assume the trial court erred by striking portions of D Magazine's summary judgment evidence.  *See* TEX. R. APP. P. 47.1.  In this opinion, we only address D Magazine's first issue asserting the trial court erred by denying the motion for summary judgment.

[3] During discovery, the Article remained available on *D Magazine's* website.

[4] When the Article was published, appellee's name was Janay Bender Rosenthal.  She subsequently changed her name to Janay Bender.  We refer to her as Bender.  The Article calls her Rosenthal.

claim. *See D Magazine Partners, LP. v. Rosenthal*, 529 S.W.3d 429 (Tex. 2017). On remand and after discovery, D Magazine filed a traditional and no-evidence motion for summary judgment, which the trial court denied. The trial court also struck portions of D Magazine's summary judgment evidence. This appeal followed.

## B. Summary Judgment Evidence

### 1. *Supplemental Nutrition Assistance Program (SNAP)*

SNAP is a federally-funded program designed to provide basic nutritional necessities to low-income individuals and families. The program is administered by the Texas Health and Human Services Commission (HHSC), and the Office of Inspector General (OIG) investigates cases of suspected SNAP fraud and abuse.

The primary factors for determining SNAP eligibility are income, assets, expenses, and household composition, and a person applying for SNAP benefits must demonstrate eligibility. SNAP recipients generally re-apply for benefits every six months. From 2011 through 2013, the maximum gross monthly income for a household of two people increased from $1,579 to $1,681; the total asset limit for the same household was $5,000.

While receiving benefits, a SNAP recipient must inform the HHSC if the person changes addresses or experiences an increase in monthly income above 130 percent of the federal poverty level. The HHSC must be notified of either of these events within ten days because changes to household composition and income could impact SNAP eligibility and award amounts. Failure to notify the HHSC of these

changes can lead to disqualification from the program, investigation by the OIG, and prosecution for theft of benefits.

Bender's SNAP paperwork shows she received benefits for herself and her daughter, A.R., from May 2011 through May 2018. In 2011, Bender reported her home address was in Irving, Texas, and she did not provide a separate mailing address.[5] Beginning in 2012, she stated her home and mailing address was on La Cabeza Drive in Dallas, Texas. La Cabeza Drive remained her home and mailing address for HHSC purposes. Bender disclosed various amounts of income to the HHSC during the time she received SNAP benefits, but never reported income above 130 percent of the federal poverty level. SNAP forms are signed under penalty of perjury, and the signor represents the information provided is true and complete to the best of the person's knowledge.

### 2.    *Idea for the Article*

The Article was written by an anonymous Park Cities parent who later was identified as Pam Kripke, a freelance writer who previously contributed articles to *D Magazine* and other publications. The Article was her only anonymous publication. Kripke's idea for the Article came from friend and fellow Park Cities parent, Susan Harriman. Harriman told Kripke about a woman who received food

---

[5] The SNAP form has space to provide a home address and, separately, a mailing address.

stamps even though she lived with her wealthy fiancé whose home was valued at more than $1 million.  Kripke knew Harriman previously dated Bender's fiancé.

Kripke contacted Tim Rogers, Editor of *D Magazine*, and suggested writing an article about a woman who received SNAP benefits "while living with her rich boyfriend in UP [University Park]."  In response, Rogers commented: "This woman deserves to be outed.  And I think that's a good way to do it."  Kripke proceeded to write the Article.

*3.     Bender's Eligibility for SNAP Benefits*

The Article states Bender had to establish she was "still destitute" every six months[6] to receive SNAP benefits.  To obtain SNAP benefits after moving in with her boyfriend and while living in the University Park "lap of luxury," the Article claims Bender provided false information to the HHSC; she used an old address on La Cabeza Drive rather than giving the HHSC her boyfriend's address on Bryn Mawr Drive; and she falsely represented herself as head of household.  Bender maintains these statements are false.

Bender dated Michael Zidell from December 2011 until the summer of 2013; they became engaged in the summer of 2012.  It is uncontested that, at all relevant times, Zidell earned a six-figure income and owned and lived in a house on Bryn Mawr Drive in Dallas, Texas, that was valued at more than $1.25 million and located

---

[6] The uncontested evidence shows a person is not required to be "destitute" to obtain SNAP benefits.

within the Highland Park Independent School District (HPISD) boundaries. His home was not in University Park or Highland Park. Bender never provided the HHSC with Zidell's address or information about his income or assets. The parties dispute whether Bender moved in with Zidell during the 2012–2013 timeframe, Zidell was the head of Bender's household, and, as a result, she was required to disclose his address, income, and assets to the HHSC.

### a. Bender's Living Arrangements

Zidell testified Bender never moved into his house, and they agreed Bender would maintain her residence until they were married. She kept some clothing and toiletries at his house, but did not move her furniture. Bender and Zidell both testified they purchased and prepared food separately and generally did not consume food purchased and prepared by the other person. However, both conceded there may have been occasions when each ate food purchased by the other person.

Zidell recalled that in March or April 2012, Bender spent two or three nights per week at his house. Bender testified she initially stayed "just once in a while" or about once per week. Zidell estimated that after July 2012, Bender spent three to five nights per week at his house. Bender testified she stayed at Zidell's house "frequently" in the summer 2012; sometimes she stayed five nights per week and she may have spent seven. Zidell did not recall any full weeks that Bender spent at his house.

Eventually Bender's daughter, A.R., began staying overnight also and had a bedroom at Zidell's house. For the 2012-2013 school year, A.R. was enrolled in the HPISD. Bender and A.R. generally stayed at Zidell's house on school nights and spent the weekends at the house on La Cabeza Drive where Bender's parents lived. Zidell recalled that Bender "spent a lot of time" at her parents' house because she helped care for her ailing mother.

The school district's records list Zidell's address as A.R.'s address and Zidell as her "step-father." Zidell testified he completed enrollment paperwork for A.R. to attend a HPISD school because it was safe; at her former school, her abusive father repeatedly came to the campus. Although Bender testified she may have received HPISD-related mail at Zidell's house, Zidell did not recall Bender receiving mail.

In response to interrogatories dated February 2019, Bender stated her living arrangements as follows:

January 2011 to present: Address on La Cabeza Drive

2011 – 2012: Address in Irving, Texas

2012 – 2013: Address on Bryn Mawr

During her deposition, Bender described her living arrangements beginning in 2011: she initially had an apartment in north Dallas, then moved in with her parents in March 2011, and then moved to Irving. "And then back with my parents, and then Michael [Zidell]." Bender stated that shortly after the Article was published in March 2013, her relationship with Zidell became strained and she "moved out."

On February 16, 2012, Bender sent a letter to her ex-husband, Jamie Rosenthal, providing "formal notice" that her address changed from an apartment in Irving, Texas, to an address on Bryn Mawr Drive. Bender testified she sent the letter to Jamie "because of fear of my ex-husband [and] to establish a safer drop off point for my daughter." Zidell helped Bender write the February 16 letter and told her to use his address to establish a safe drop-off location for A.R. Zidell wanted to be present for drop-offs because Jamie was abusive and Bender was afraid of him. Bender sent a copy of the letter to the State Disbursement Unit.

On August 7, 2012, Bender filed an affidavit of indigency with a district court and stated her address was on La Cabeza Drive.

Kripke testified she believed Bender moved in with Zidell because A.R. attended school in the HPISD and the HPISD directory showed A.R. lived at the Bryn Mawr Drive address. Kripke did not know how many nights per week Bender and A.R. slept at the houses on Bryn Mawr Drive and La Cabeza Drive.

Stuart Bowen, an expert retained by D Magazine, is the former Inspector General of the HHSC. Bowen averred Bender made material misrepresentations to the HHSC regarding her address when she applied to renew her SNAP benefits in October 2012 and April 2013. To reach this conclusion, Bowen examined the geographic locations of the grocery stores where Bender used her SNAP benefits and noted Bender's SNAP purchases shifted in January 2012 from the area surrounding her Irving address to the area surrounding Zidell's house. From January

–8–

2012 through April 2013, Bender made 95 purchases with her SNAP card within six miles of Zidell's house, but only 5 purchases within six miles of La Cabeza Drive. Bowen believed the evidence "suggests that Bender was living in Zidell's house in the January 20, 2012 through April 30, 2013 timeframe."

Dr. Rochelle Webb, Bender's expert witness and former HHSC employee,[7] initially opined Bender remained eligible for SNAP benefits at all relevant times (regardless of Bender's residential or mailing address) because Bender lived in Texas and had no changes to her SNAP household members and their calculable income and assets. In formulating this opinion, Webb relied on HHSC documents, and she assumed Bender was truthful with the HHSC. Webb testified: "It doesn't matter who is living in the house under policy as long as she's purchasing and preparing [food] separately." "So if she had an unreported move and she moved in one [sic] with someone else and she still purchased and prepared [food] separately, she would still be eligible." Later Webb testified that Bender was required to disclose everyone who lived in the same house and, if she lived with Zidell five to seven nights per week, she needed to disclose that fact even though it would not have affected her benefits.

An applicant for SNAP benefits must disclose the identity of each person in the household and provide the income and assets of all members of the household.

_____

[7] Webb worked for HHSC from 1990 to 2004.

It is uncontested that Bender received benefits based on a household of two people: A.R. and herself. The parties disagree about what constitutes a "household" for SNAP purposes and whether Zidell was a member of Bender's household.

Lawrence Singleton, Jr., the director of public benefit integrity with the HHSC, testified a "household" is anyone living in a house, which would include a live-in fiancé. Therefore, if Bender lived in Zidell's house, she was required to disclose his income to the HHSC. However, Sandra Manrique-Sanchez, an investigator for the HHSC, defined "household" as "everyone that is required to be reported when you're applying for benefits, like your children and spouse." A fiancé is part of the household only if the parties have mutual children. If the parties do not have mutual children and the fiancé is not paying the recipient's bills, then the recipient is not required to disclose the fiancé. A "household" does not include everyone who lives in a house. For example, an adult sibling living in the same house as the SNAP recipient may not be part of the household.

### b. Bender's Income

D Magazine maintains Bender failed to inform the HHSC about income she earned while receiving benefits, which allowed her to obtain benefits for which she was not eligible. The HHSC required Bender to report her income, assets, and expenses each time she applied for SNAP benefits. Bender consistently reported she was self-employed and never declared earning income above 130 percent of the federal poverty level.

Bender was employed until April 2011. In May 2011, she was unemployed and applied for SNAP benefits, which she received. When she applied to renew her benefits in September 2011, Bender represented she was self-employed and earned $0-200 per week. The following month, the HHSC approved a $367 per month benefit for Bender. The HHSC's October 2011 notice to Bender states in part: "Currently, we are budgeting $220.00 gross monthly income for your household. If at any time during your certification period,[8] your gross monthly income goes over $1694.00 (enter 130% FPIL amount) or your address changes, you must report the change within 10 days." This notice also appears on other forms the HHSC sent to Bender while she received benefits.

Bender worked for Couture Carpets from September 2011 through January 2012. Bender did not disclose this income to the HHSC even though her monthly gross income from Couture Carpets exceeded $1,694 for several months. Both Bender's and D Magazine's experts testified Bender was required to report her income from Couture Carpets to HHSC within 10 days of her income exceeding $1,694, and her failure to do so was a SNAP program violation. They also agreed that if Bender had declared this income, her benefits may have been reduced. Stuart Bowen, an expert retained by D Magazine, calculated Bender received up to $1,835 in benefits to which she was not entitled. Webb, Bender's expert, stated that if

---

[8] The certification period was November 1, 2011 through April 30, 2012.

Bender projected she would receive the same level of income going forward, she could have become ineligible for benefits.

Bender's 2012 federal income tax return shows she worked as an administrative assistant earning $5,375.00 in gross income in 2012, but she did not report this income to the HHSC. Bowen opined that if Bender reported this income to the HHSC, her benefit award would have been reduced and, because she did not, she received more benefits than she was entitled to.

Bender worked for the North Texas Fair Housing Center (NTFHC) from July 2013 through February 2014 and earned more than $6,000; she did not report this income to the HHSC. Rather, during this time period, she told the HHSC she performed odd jobs and earned an average of $75 per week. Bowen opined that Bender's benefit would have been "substantially reduced" if she had disclosed her income from the NTFHC to the HHSC.

Bowen concluded Bender misrepresented and omitted several material facts when applying to renew her SNAP benefits and such misrepresentations, individually and viewed together, amounted to SNAP fraud and abuse which, if discovered, should have led to revocation of her benefits, disqualification from the SNAP program, an investigation by the OIG, and a referral for prosecution for theft, tampering with government records, and/or perjury.

### c.    A.R. Living Trust[9]

The Article states that, according to the Dallas Central Appraisal District (DCAD), Bender "has a relationship to other households, too. Nine properties are listed in the name of her daughter's living trust."

At the time the Article was published, the A.R. Living Trust owned nine vacant lots in South Dallas. Bender's brother, Jonathan Bender, established and managed the trust as part of his estate planning. Jonathan did not tell Bender or A.R. about the trust, and neither Bender nor A.R. ever received anything of value from the trust. *D Magazine* did not contact Jonathan before publishing the Article.

Kripke testified she included information about the trust to show Bender was not destitute. She noted the Article did not define the type of relationship and maintained Bender had a relationship to the properties because she is A.R.'s mother, even though that association did not give Bender any rights to the trust assets. When asked about the properties in the trust being empty lots rather than "households," Kripke conceded she never saw the properties. She further acknowledged she did not know the impact of the trust on Bender given that Bender had no ownership interest in the properties or trust.

Rogers testified DCAD showed the A.R. Living Trust owned the properties, and *D Magazine* did not investigate whether Bender had any interest in the trust.

---

[9] The formal name of the trust was Bender's daughter's name followed by "Living Trust." As we have done elsewhere in this opinion, we have substituted A.R.'s initials for her name.

Rogers explained: "That's why we were very careful with the language there, that she had a relationship to those other households." He maintained that, because the trust bore A.R.'s name, Bender must have a relationship with the properties.

### d.     Criminal History

The Article states police records show Bender has "numerous theft-related arrests and convictions" in North Texas. It is uncontested that Bender was arrested for shoplifting when she was eighteen years old; that arrest did not result in a conviction. In two other cases, she received deferred adjudication, which she successfully completed. Bender was never convicted of any theft-related offense.

Rogers testified Bender committed multiple crimes. When asked whether she was convicted of any crimes, Rogers testified: "No. As it turns out, she wasn't convicted. We made a mistake about that. She had only pled guilty to them." Rogers explained the *D Magazine* staff saw Bender pleaded guilty and "assumed at the time that pleading guilty to a crime was equivalent to a conviction." When asked about Bender's criminal history, Kripke testified: "She has numerous arrests, and she had admitted to having committed crimes. You can be semantical about it. The layperson understands guilt, convictions, all the same. This is not a legal journal. This is D Magazine."

Bender averred that several people who read the Article thought she had been arrested and charged with welfare fraud or theft of welfare benefits, but she has never been charged with or convicted of any crime associated with her receipt of SNAP

–14–

benefits. A criminal defense lawyer hired by Bender filed an affidavit explaining that welfare fraud is a felony in Texas and, although the Article accuses Bender of welfare fraud, "she has never been arrested or charged with welfare fraud, theft of benefits, or any other related crime."

### 4. Post-Publication Investigations

Before the Article was published, Kripke called the HHSC media hotline and, after identifying herself as a reporter, spoke to Stephanie Goodman, HHSC's Director of Communications. Kripke wanted to verify non-public information about Bender that she said she received from a local HHSC office. Goodman thought Kripke's questions were unusual for a reporter and "more personal in nature." After publication, Kripke sent Goodman a link to the Article and asked whether the HHSC planned to investigate Bender.

On April 23, 2013, Goodman emailed Bender:

> The Health and Human Services Commission Office of Inspector General (OIG) has reviewed the allegations contained in a March story in D Magazine titled "The Park Cities Welfare Queen" and related information. Our investigation found no evidence that state benefits had been fraudulently obtained or that abuse of benefits was occurring.

Goodman testified the email related to SNAP benefits Bender received.

On May 1, 2013, Jack Stick, then the HHSC Deputy Inspector General, sent a letter to Bender stating:

> The Health and Human Services Commission Office of Inspector General has reviewed the assertion of facts as reported by D Magazine in a March story titled "The Park Cities Welfare Queen," and related

information. Our investigation found no evidence anyone has fraudulently obtained or otherwise abused state benefits.

Stick testified he was contacted by Bender or her attorney and asked to provide a letter stating Bender did not fraudulently obtain benefits. He agreed to conduct a "survey investigation," which is a high-level documentary review to determine whether a more in-depth investigation is warranted. The investigation of Bender's file did not reveal any "red flags." Had he seen an indication that Bender abused a program or illegally obtained benefits, the OIG would have sought recoupment. The letter was not intended to exonerate or inculpate Bender; it was only intended to show that a survey investigation did not produce evidence of abuse of state benefits.

Stick explained SNAP benefits are federal, not state, benefits. If he had intended his letter to reflect a review of SNAP benefits, then he would have used either the term SNAP or noted the investigation was of state and federal benefits. He did not believe the HHSC investigated Bender's receipt of SNAP benefits; the investigation focused on Medicaid benefits.

Stick had not seen the April 23, 2013 email that Goodman sent to Bender before his deposition and was surprised Goodman sent the email. He testified Goodman's role is to handle press inquiries and "[t]his is an investigative matter. . . . So there was no reason for her to do this."

On April 17, 2018, the accounts receivable unit at the HHSC, which is responsible for collecting on all SNAP over-issuance claims sent a letter stating: "In

response to a recent inquiry regarding any debts owed to our department by Janay Bender . . ., we have found that this individual, as of 4/17/2018, is not associated with any over-issuance Claim(s)." Deposition testimony shows the letter was not issued after an investigation; it was prepared in response to a request for information contained in a subpoena issued by D Magazine.

LAW & ANALYSIS

A.    Standard of Review

We review the denial of a motion for summary judgment de novo. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). As the party moving for summary judgment, D Magazine bore the burden of proof. *Id.* While D Magazine sought summary judgment on traditional and no-evidence grounds and while the burdens vary for the different types of motions, both parties presented summary judgment evidence. *See id.* Therefore, the "differing burdens are immaterial and the ultimate issue is whether a fact issue exists." *Id.* A fact issue exists if there is more than a scintilla of probative evidence. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013); TEX. R. CIV. P. 166a(c),(i). We review the evidence in the light most favorable to Bender, the nonmovant, and indulge every reasonable inference and resolve any doubts against the motion. *Id.*

B.    Defamation

In a defamation case, when, as here, the defendant is a media outlet and the plaintiff is a private citizen, the plaintiff must prove (1) a publication by the

–17–

defendant, (2) that defamed the plaintiff, and (3) which was published negligently with regard to the truth. *See id*. at 61.

When determining whether a publication is capable of a defamatory meaning, the court examines its "gist." *Rosenthal*, 529 S.W.3d at 434. "That is, we construe the publication 'as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.'" *Id.* (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)); *see also Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) ("It is well settled that 'the meaning of a publication and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.'" (quoting *Turner*, 38 S.W.3d at 115)). "Consistent with this approach, under the 'substantial truth doctrine' a publication's truth or falsity depends on whether the publication 'taken as a whole is more damaging to the plaintiff's reputation than a truthful [publication] would have been.'" *Id.* (quoting *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016)). "[A] publication with specific statements that err in the details but that correctly convey the gist of a story is substantially true. Conversely, even if all the publication's individual statements are literally true, the story can convey a false or defamatory meaning by omitting or juxtaposing facts." *Id.* (quoting *Neely*, 418 S.W.3d at 63-64 (internal citations and quotation marks omitted)).

–18–

D Magazine moved for summary judgment on the grounds that: (1) "Bender's defamation claim fails because the 'gist' of the Article, as construed by the Texas Supreme Court, is true as a matter of law," (2) the Article conveys a non-actionable opinion rather than verifiable statements of fact, and (3) D Magazine did not act negligently by publishing the Article.

## C.          The Gist of the Article

D Magazine argues the trial court erred by denying its motion for summary judgment because the Texas Supreme Court already construed the Article's gist and determined it is substantially true. D Magazine asserts the supreme court determined the gist of the Article is that Bender "provid[ed] false information to the [HHSC] (either affirmatively or by omission) in order to obtain benefits to which she was not entitled." *See id.* at 438. And, D Magazine argues, Bender did exactly that; she provided false information to the HHSC, including information about her income, residence, and household composition, which enabled her to obtain benefits to which she was not entitled.

The supreme court's opinion is not as narrow as D Magazine interprets it to be. The opinion states in relevant part:[10]

> The article never expressly accuses Rosenthal of lying or fraudulently obtaining benefits, and D Magazine insists that each statement in the article is literally, or at least substantially, true. But the article's gist is based on "a reasonable person's perception of the entirety of [the article] and not merely on individual statements."

---

[10] The supreme court referred to Janay Bender as "Rosenthal."

–19–

Viewing the article as a whole, we conclude that a reasonable person could perceive it as accusing Rosenthal of providing false information to the Commission (either affirmatively or by omission) in order to obtain benefits to which she was not entitled. The entire article is under the stark heading "CRIME" and is accompanied by an unrelated mug shot. It affirmatively states that Rosenthal "must have been less than forthcoming," at least in renewing her SNAP application, and follows that statement with examples throughout the article of instances in which Rosenthal, at least by implication, either withheld information from or reported it inaccurately to the Commission. In sum, a reasonable person could construe the article to accuse Rosenthal of fraudulently obtaining thousands of dollars of SNAP benefits.

D Magazine's arguments to the contrary are unavailing. For example, D Magazine asserts that the "CRIME" heading is consistent with the article's criticism of SNAP, contending that the article is about how someone with a history of theft, like Rosenthal, is nevertheless able to obtain SNAP benefits. While Rosenthal's history of theft is discussed at the end of the article, it is not the focus. And it does not convince us that D Magazine's construction of the article as a whole is the only reasonable one. To the contrary, a reasonable person could certainly conclude that an article under the heading "CRIME" is in fact about the commission of a crime. And, as discussed above, that conclusion would be supported by the article's contents.

*Id.* (footnote omitted) (internal citations omitted).

The supreme court determined a reasonable person could conclude that the Article is about Bender committing a crime by providing false information to the HHSC to obtain thousands of dollars of SNAP benefits to which she was not entitled. The supreme court's conclusion is consistent with Bender's affidavit testimony that a number of people who read the Article thought she had been arrested and charged with welfare fraud or theft of welfare benefits. While D Magazine asserts the statements in the Article are substantially true, thus entitling it to summary judgment,

–20–

we disagree. There are several fact issues about whether Bender committed a crime, and these fact issues preclude summary judgment.

The Article implies that even though Bender lived with her wealthy boyfriend in his expensive home in University Park, she intentionally left portions of her HHSC application blank to avoid revealing Zidell's income and assets. By omitting information, she was able to fraudulently obtain what the Article describes as "a cool $10,276" to which she was not entitled. Bender presented evidence raising a fact issue about whether she lived on La Cabeza Drive or on Bryn Mawr Drive (or both),[11] and, thus, whether she moved in with Zidell. It is uncontested that Bender spent multiple nights per week at Zidell's house from the spring of 2012 to the summer of 2013, and her daughter attended school in the HPISD based on Zidell's address. Bender's interrogatory responses reflect she moved in to and later moved out of Zidell's house, but her evidence also shows she lived on La Cabeza Drive from January 2011 through February 2019 while also living on Bryn Mawr Drive from 2012 until 2013. Zidell testified Bender never moved in to his house, and they agreed she would not move in with him until they were married (an event that did not occur).

Additionally, while the HHSC requires applicants to provide a home address and a mailing address, the record does not show what is considered a home address

---

[11] We make no determination about whether Bender could have had two home addresses simultaneously. We only conclude there is more than a scintilla of evidence that she did so.

–21–

for HHSC purposes. The record does not provide a standard by which to determine whether the house on Bryn Mawr Drive should have been reported to the HHSC as Bender's home address because she spent multiple nights per week there. Further, even if we assume Bender was required to inform the HHSC that she spent nights at Zidell's house, there is a fact issue about how that information would have impacted the SNAP benefits she received, if at all.

Assuming Bender did live in Zidell's house, there is a fact issue about whether Zidell should have been considered part of Bender's household for SNAP purposes and whether she was required to disclose his income and assets to the HHSC. The record includes different definitions of "household." Lawrence Singleton defined "household" to be anyone living within a house, including a live-in fiancé. He testified that if Bender lived with her fiancé, then she was required to disclose his income. However, Sandra Manrique-Sanchez testified a "household" does not include everyone who lives in a house and a fiancé is part of the household only if the parties have mutual children and the fiancé is paying the recipient's bills.

If Bender moved in with Zidell, then, under Singleton's definition of "household," Zidell was part of Bender's household (or she was part of his). However, under Manrique-Sanchez's definition, Zidell was not because the parties did not have mutual children and Zidell testified he did not pay any of Bender's

separate bills.[12]  Based on the evidence in the record, there is more than a scintilla of evidence that Zidell was not part of Bender's household, and, therefore, she was not required to disclose his assets or income to the HHSC.  Further, if Zidell was not part of Bender's household, then the Article's inference that Bender falsely claimed to be head of household is incorrect.

While the record appears to show Bender failed to accurately report her income to the HHSC, the record is not clear whether reporting that income would have made her ineligible for benefits or would have reduced the SNAP benefits she received.  No facts in the summary judgment record support the Article's implication that she fraudulently obtained "a cool $10,276."

There is a fact issue about whether the HHSC concluded Bender did not fraudulently obtain SNAP benefits.  In the spring of 2013, two people from the HHSC notified Bender that the OIG found no evidence that state benefits were fraudulently obtained or abused.  Goodman understood the email related to the SNAP benefits while Stick believed it related to Medicaid.  The record also includes the April 17, 2018 letter stating Bender is not associated with any over issuance claims as of the date of the letter.  While D Magazine argues these pieces of correspondence are not exculpatory or were written without all relevant information,

_____

[12] Zidell paid all bills related to his home, and Bender did not pay rent to him.

there is more than a scintilla of evidence that these pieces of correspondence show the OIG concluded Bender did not abuse SNAP benefits.

There is also a fact issue about whether the Article, taken as a whole, is more damaging to Bender's reputation than a truthful statement would have been. Some facts in the record show a truthful report would have stated that Bender lived in Dallas while her daughter attended schools in the HPISD. She previously had been arrested for theft-related offenses and her mug shot was taken following one of those arrests; those arrests are unrelated to her receipt of SNAP benefits and she was never convicted of any theft-related offense. Although Bender may have received more benefits than she was entitled to by failing to report income and update her address, the alleged overpayment amount is unknown. The Article, however, states Bender was a University Park mom living in the "lap of luxury" who has past criminal convictions for theft-related offenses and could be read to imply that she stole before and has done so again, but this time it was a "cool $10,276." Or, as Kripke summarized the facts in an email to Rogers, "[s]tealers steal."

There are multiple fact issues about whether Bender committed a crime by providing false or incomplete information to the HHSC to obtain thousands of dollars of SNAP benefits to which she was not entitled. Having reviewed the entire record, we conclude there is more than a scintilla of evidence that the gist of the Article is not substantially true.

## D. Opinion v. Fact

D Magazine moved for summary judgment on the ground that the Article conveys non-actionable opinions rather than verifiable statements of fact, and D Magazine raises this argument on appeal. D Magazine asserts that to the extent a reasonable person could read the Article to accuse Bender of misrepresenting or omitting information to obtain benefits to which she was not entitled, the implication was conveyed as opinion rather than a verifiable statement of fact and is, therefore, not actionable.

Defamation requires "the publication of a false statement of fact to a third party." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018) (citing *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017)). Statements that are not verifiable as false are not defamatory. *Marble Ridge Capital LP v. Neiman Marcus Group, Inc.*, 611 S.W.3d 113, 124 (Tex. App.—Dallas 2020, pet. abated); *see also Tatum*, 554 S.W.3d at 639. Even if a statement is verifiable as false, it does not give rise to liability if the "entire context in which it was made" discloses that it is merely an opinion masquerading as fact. *Tatum*, 554 S.W.3d at 639. "[S]tatements that cannot be verified, as well as statements that cannot be understood to convey a verifiable fact, are opinions." *Id.* Whether a statement is an opinion is a question of law. *Id.* We "focus not only 'on a statement's verifiability,' but also on 'the entire context in which it was made.'" *Id.* (quoting *Bentley*, 94 S.W.3d at 581). Additionally, we must remain mindful of the type of writing at

issue. *Id*. ("The type of writing at issue, though not dispositive, must never cease to inform the reviewing court's analysis."); *see also Marble Ridge Capital LP*, 2020 WL 5814487, at \*7.

The Article appears under the heading "CRIME" as though it is a fact-based crime report. *Rosenthal*, 529 S.W.3d at 438 ("a reasonable person could certainly conclude that an article under the heading "CRIME" is in fact about the commission of a crime."). It never purports to be an opinion piece. The Article contains numerous verifiable, factual statements, including: Bender received $367 in food stamps per month; Bender left information on her HHSC application blank; Bender moved in with her boyfriend; Bender lived in University Park; Bender's driver's license lists an "old address" on La Cabeza Drive; Bender provided the HHSC with her "old address"; Robert Bender owns the house on La Cabeza Drive; Bender filed an affidavit of indigency on August 7, 2012, which showed her address was on La Cabeza Drive (and falsifying such a document is a felony); Bender sent a letter on February 22, 2012 stating her address was on Bryn Mawr Drive; Bryn Mawr Drive is the address listed as her child's address in the HPISD school directory; Zidell was head of household because he owned and lived in the house on Bryn Mawr Drive; Bender wore a diamond ring on her wedding ring finger; Bender had a relationship to nine other households; Bender was arrested for and convicted of theft-related crimes; and how and where Bender used her SNAP benefits.

Indeed, nearly every statement in the Article is a statement of fact that could be verified. Because the Article is a publication of factual statements, we conclude it can form the basis of a defamation claim. *See Marble Ridge Capital LP*, 611 S.W.3d at 124 (citing *Tatum*, 554 S.W.3d at 634 (party cannot avoid liability for defamatory implications simply by couching them within subjective opinion); *Rosenthal*, 529 S.W.3d at 437–38 (when viewing communications as a whole, reasonable person could perceive communications as accusing claimant of providing false information to agency in order to obtain benefits to which she was not entitled); *Bentley*, 94 S.W.3d at 569–71 (reasonable listener could interpret radio host's comments as defamatory)).

### E.        Negligent Publication

D Magazine argues the trial court erred by denying its motion for summary judgment because it did not negligently publish the Article. D Magazine asserts the evidence shows it "did considerable research in the editorial and fact-checking process" and "the undisputed summary judgment evidence shows that D Magazine neither knew nor should have known that the Article's gist was false." When the plaintiff is a private party seeking defamation damages from a media defendant, the defendant is negligent if it knew or should have known a defamatory statement was false or failed to investigate the truth or falsity of the statements. *Adams v. Starside Custom Builders, LLC*, No. 05-15-01162-CV, 2018 WL 6427640, *12 (Tex. App.— Dallas Dec. 7, 2018, pet. denied) (mem. op.) (citing *Neely*, 418 S.W.3d at 72;

*Hoskins v. Fuchs*, 517 S.W.3d 834, 843 (Tex. App.—Fort Worth 2016, pet. denied));

*see also Dietrich v. Chambers*, No. 03-18-00846-CV, 2020 WL 6478415, at *5 (Tex. App.—Austin Oct. 28, 2020, no pet. h.) (mem. op.) ("Texas courts have also described this as the failure to investigate the truth or falsity of a statement before publication, and the failure to act as a reasonably prudent person.").[13]

Krista Nightengale, the former Managing Editor at *D Magazine*, was responsible for fact-checking the Article before publication. At her deposition, Nightengale did not remember how much time she spent fact-checking the Article and was unable to remember if she checked whether: (1) the Bryn Mawr Drive address was in Dallas or University Park; (2) a person, or specifically Bender, must be destitute to obtain SNAP benefits; (3) La Cabeza Drive was Bender's old or current address and whether it appeared on Bender's driver's license; (4) La Cabeza Drive would be considered an old address if Bender slept there two or three nights per week; (5) La Cabeza Drive was the address in the HHSC's database and whether it was the same address Bender listed in her August 7, 2012 Affidavit of Indigency; (6) head of household is a term of art or how head of household might relate to

---

[13] When the Texas Supreme Court previously considered this case, it concluded Bender provided sufficient evidence to make a prima facie case of D Magazine's negligence in publishing the Article. *See Rosenthal*, 529 S.W.3d at 440. (considering D Magazine's TCPA motion to dismiss). The supreme court reached this conclusion after considering an affidavit from Bender about her telephone conversation with Rogers before the Article was published and D Magazine's failure to contact the HHSC before publishing the Article even though "much of the article was premised on personal information about [Bender] purportedly obtained from the Commission." *Id.* Discovery showed the information in Bender's affidavit that the supreme court relied on was incorrect and the information the Article attributed to the HHSC was correct. Thus, D Magazine argues, the supreme court's previous conclusion about negligence is not controlling.

HHSC regulations; (7) Zidell was Bender's fiancé; (8) Bender wore a diamond ring on her left hand, fourth finger in a picture on Facebook; and (9) the person named A.R. whose address appeared in the HPISD school directory was the same person as the A.R. of the A.R. Living Trust. Nightengale did not fact check where the properties in the A.R. Living Trust were located. When asked to explain the statement that, according to DCAD, Bender "has a relationship to other households," Nightengale testified: "Just that there's a tie to other properties." She did not know what that tie was or whether she fact-checked the tie. As to the Article's statements that Bender had numerous arrests and convictions, Nightengale stated in an affidavit that she reviewed records from the Texas Department of Public Safety, and Nightengale attached those records to her affidavit.

D Magazine does not dispute there are numerous factual inaccuracies in the Article. But based on the testimony from Nightengale, D Magazine's employee responsible for fact-checking the Article, there is more than a scintilla of evidence that D Magazine failed to investigate the truth or falsity of the statements in the Article before it was published. Viewing the evidence in the light most favorable to Bender, fact issues exist whether D Magazine negligently published the Article.

CONCLUSION

Having concluded fact issues exist regarding whether the gist of the Article is substantially true; whether the Article contains verifiable statements of fact rather than non-actionable opinions, and whether D Magazine negligently published the

–29–

article, we overrule D Magazine's first issue.  We affirm the trial court's November 22, 2019 Order Denying Defendants' Amended Traditional and No-Evidence Motion for Summary Judgment.

191525f.p05

/Erin A. Nowell//
ERIN A. NOWELL
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

D MAGAZINE PARTNERS, L.P. D/B/A D MAGAZINE F/K/A MAGAZINE LIMITED PARTNERS, L.P. AND ALLISON MEDIA, INC., Appellants

No. 05-19-01525-CV    V.

JANAY BENDER ROSENTHAL, Appellee

On Appeal from the 134th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-14-01346. Opinion delivered by Justice Nowell. Justices Molberg and Reichek participating.

In accordance with this Court's opinion of this date, the trial court's November 22, 2019 Order Denying Defendants' Amended Traditional and No-Evidence Motion for Summary Judgment is **AFFIRMED**.

It is **ORDERED** that appellee Janay Bender Rosenthal recover her costs of this appeal from appellants D Magazine Partners, L.P. d/b/a D Magazine f/k/a Magazine Limited Partners, L.P. and Allison Media, Inc.

Judgment entered this 9th day of June 2021.

–31–