# Supreme Court of Texas

No. 22-0103

Polk County Publishing Company and Valerie Reddell,

*Petitioners,*

v.

Tommy Lamar Coleman,

*Respondent*

On Petition for Review from the
Court of Appeals for the Ninth District of Texas

**Argued September 14, 2023**

JUSTICE BLACKLOCK delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Devine, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

Justice Boyd concurred in the judgment and joined the opinion of the Court as to Part III.C.

In June 2020, a small newspaper in Polk County ran a story criticizing a local assistant district attorney named Tommy Coleman. Most of the article criticized the Williamson County District Attorney's office, where Coleman previously worked, for its involvement in the infamous wrongful conviction of Michael Morton. Among the article's

claims about Coleman was the statement that he "assisted with the prosecution of Michael Morton" while a prosecutor in Williamson County. The 1987 conviction of Michael Morton, which involved prosecutorial misconduct in the handling of evidence, happened long before Coleman started practicing law. Morton was exonerated in 2011 after spending nearly 25 years in prison.

Coleman sued for defamation, claiming that the article's statement that he "assisted with the prosecution of Michael Morton" was false and defamatory. At this stage of the proceedings, he does not challenge the accuracy of anything else in the article. The article described an episode in which Coleman, while a prosecutor for Williamson County, was heard in the courtroom during a post-conviction hearing mocking requests by Morton's attorneys for DNA testing of the piece of evidence that eventually exonerated Morton: "'Ewww! Bloody bandana! Bloody bandana,' Coleman is reported as saying in a demeaning tone during a hearing in September 2011." This regrettable episode, the veracity of which Coleman does not contest at this stage of the case, was the only factual detail the article offered to describe the way in which Coleman "assisted with the prosecution of Michael Morton."

The defendants now contend, among other arguments, that the challenged statement is not actionably false. As explained in more detail below, we do not determine the truth or falsity of the article's statement that Coleman "assisted with the prosecution of Michael Morton" by asking whether the statement is a legally precise characterization of the role Coleman played as an attorney in the sad

2

saga of Michael Morton's prosecution and exoneration. Instead, this Court's precedent requires that we judge the truth or falsity of an allegedly defamatory statement by identifying the "gist" of what the statement conveys about the plaintiff to a reasonable reader of the entire article. If the gist of the challenged statement, within the context of the article as a whole, is true, then the statement is considered substantially true and therefore not actionable—even if the statement errs in the details.

As explained below, we conclude that, in its context, the article's claim that Coleman "assisted with the prosecution of Michael Morton" was substantially true given Coleman's public involvement in his office's efforts to keep Morton behind bars by resisting DNA testing of the "bloody bandana." The statement is therefore not actionably defamatory, and Coleman's claims should be dismissed.

## I.

## A.

Tommy Coleman is a career prosecutor. From 2008 to 2012, he served as an assistant district attorney in the Williamson County DA's office. That office wrongfully prosecuted Michael Morton for murder in the 1980s and then resisted later efforts to determine Morton's innocence, efforts which culminated in Morton's exoneration in 2011.[1]

---

[1] The long history of the Morton case has been widely reported. *See, e.g.*, Pamela Colloff, *The Innocent Man, Part One*, TEXAS MONTHLY, November 2012, https://www.texasmonthly.com/true-crime/the-innocent-man-part-one; Pamela Colloff, *The Innocent Man, Part Two*, TEXAS MONTHLY, December 2012, https://www.texasmonthly.com/true-crime/the-innocent-man-part-two.

In 1986, Morton's wife Christine was found bludgeoned to death in bed in the couple's Austin home. Williamson County prosecutors charged Morton with the murder. During the investigation, a bloody bandana was found at a construction site about 100 yards from the Mortons' home. The Williamson County DA's office never DNA tested the bandana or turned it over to Morton's defense attorneys. Morton was convicted of his wife's murder and sentenced to life in prison in 1987. All along, he maintained his innocence.

Beginning in 2005, Morton's attorneys sought access to potentially exculpatory evidence previously withheld by prosecutors, including the bloody bandana. In 2010, after years of opposition by Williamson County prosecutors, a court ordered DNA testing of the bloody bandana. The DNA on the bandana matched that of a convicted felon from California named Mark Alan Norwood. Norwood had a criminal record in Texas and lived in the state at the time of Christine Morton's murder. The same DNA was found at the murder scene of Debra Baker in Travis County in 1988, after Christine Morton's murder. Because of the DNA testing, Michael Morton was exonerated, and Mark Norwood was convicted for the murders of both Christine Morton and Debra Baker.

Morton was released from prison in 2011, almost 25 years after his wrongful conviction. Tommy Coleman was a Williamson County Assistant District Attorney at the time of Morton's exoneration and

---

The parties do not dispute any of this background information about the Morton case, some of which may be outside the record but which we provide for context.

4

during the post-conviction proceedings that precipitated the DNA testing of the exonerating bandana. The newspaper article in question reports that, in the courtroom during one of Morton's post-conviction hearings, Coleman was heard demeaning Morton's efforts to prove his innocence: "Ewww! Bloody bandana! Bloody bandana . . . ." At this stage of the litigation, Coleman does not dispute this episode. Instead, he maintains that, despite his courtroom comments, he did not "assist" in Morton's post-conviction proceedings because he never argued in court, signed pleadings, discussed case strategy, or gave any public statements or interviews in the Morton case.

The disputed article reports that Coleman left his position in Williamson County in 2012 after a new DA decided to revamp the office by replacing prosecutors she believed were trained in the practices that led to Morton's wrongful conviction. Coleman has not contested this characterization of events. At the time of the article, Coleman was a prosecutor in Polk County, but his counsel stated at oral argument that Coleman has now moved to a different DA's office.

**B.**

On June 18, 2020, the *Polk County Enterprise*, a newspaper in Polk County, published a story by Valerie Reddell titled, "Battle lines drawn over prosecutor's conduct." The article's first paragraph refers to "one of the worst episodes of wrongful conviction in the history of Texas jurisprudence" and then says that "one of the prosecutors in this case made a soft landing in the Polk County Criminal District Attorney's Office." The article's second paragraph states: "Prior to his arrival in Livingston, Tommy Lamar Coleman assisted with the prosecution of

5

Michael Morton during his tenure at the Williamson County District Attorney's Office." This statement—that Coleman "assisted with the prosecution of Michael Morton"—is the focus of the parties' arguments.

Most of the remainder of the article describes the history of the Morton case in a way that is sharply critical of the Williamson County DA's office. The article recounts Coleman's controversial courtroom utterance, which is described as follows:

> Coleman is singled out in media reports for mocking requests to test that bandana for DNA.
>
> "Ewww! Bloody bandana! Bloody bandana," Coleman is reported as saying in a demeaning tone during a hearing in September 2011.

The article contains no other factual details supporting its initial statement that Coleman "assisted with the prosecution of Michael Morton." The last few paragraphs of the article vaguely allege other instances of possible misconduct by Coleman, though the import of these paragraphs is unclear. Coleman does not complain about these additional allegations.

Needless to say, the article did not please Coleman. He posted the article to his Facebook page with the statement, "I think someone just bought me a new Corvette today. I will be sure to put their names on the personalized plates." His then-boss, Polk County District Attorney Lee Hon, published a letter in the *Enterprise* defending Coleman. Coleman claims the article was written by Reddell as retaliation for Coleman's recent social media activity, which apparently either criticized the *Enterprise*, supported one of its competitors, or both. The content of Coleman's social media posts is not in the record, but the day after the posts, Reddell called Coleman to complain about them.

Reddell suggested the *Enterprise* might take legal action, and she asked Hon to discipline or fire Coleman. Reddell's allegedly defamatory article criticizing Coleman appeared in the *Enterprise* a few days later.

On June 25, 2020, Coleman's attorneys sent a demand letter to Reddell and to Polk County Publishing Company, which owns the *Enterprise*. The letter demanded the *Enterprise* publish a retraction on the top of the front page and provided language for the retraction. Coleman posted about the demand letter on his "Tommy Coleman for Polk County" Facebook page.

On July 2, 2020, the *Enterprise* ran a front-page "Correction" titled "Coleman not involved in Morton trial and prosecution." The five-sentence correction stated that the original article "mischaracterized" Coleman's role at the Williamson County DA's office because Coleman was not licensed as a lawyer until 2002 and "was not involved in the initial trial and prosecution of Michael Morton in 1987." It closed with an acknowledgment that "[t]he proceedings that took place between 2005 and 2011 should not have been referred to as 'prosecution.' We regret the error." Coleman posted the correction on his Facebook page.

In August 2020, Coleman sued for defamation. The defendants moved to dismiss the suit under the Texas Citizens Participation Act. The motion made several arguments, including that the challenged statement was not actionably false. The trial court denied the TCPA motion.

The court of appeals affirmed. 668 S.W.3d 385 (Tex. App.—Beaumont 2021). It held that: (1) Coleman was not a limited purpose

7

public figure; (2) Coleman established the article's falsity for TCPA purposes; and (3) Coleman did not need to show damages because the article amounted to defamation per se. *Id.* at 393–94, 398. The defendants petitioned for review in this Court, and we granted the petition.

## II.

## A.

As an initial matter, there is no dispute that the TCPA applies. Coleman filed this suit in response to the *Enterprise*'s publication of a story about matters of public concern. *See* TEX. CIV. PRAC. & REM. CODE § 27.003(a). The Morton case is plainly a matter of public concern. So are questions about the character and fitness of the prosecutors employed by the Polk County District Attorney's office, a matter of great public concern to the citizens of Polk County. Unlike some TCPA appeals, this is exactly the kind of lawsuit—by a government official against a reporter in response to a critical news story—that all can agree has been subjected by the Legislature to early testing of its merits and to early appeals.

To avoid TCPA dismissal, Coleman had to "establish[] by clear and specific evidence a prima facie case for each essential element of" his defamation claim. *Id.* § 27.005(c). One such element is "the publication of a false statement of fact" by the defendant. *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018). Among other arguments, the defendants contend that Coleman cannot establish that the article's statement that he "assisted with the prosecution of Michael Morton" is actionably false. Because we agree, we hold that Coleman's

8

defamation claim should have been dismissed, and we do not reach the defendants' remaining arguments.

**B.**

Establishing the falsity of an allegedly defamatory article is not as simple as showing that the article contains a statement that falls short of literal truth. "A statement need not be perfectly true; as long as it is substantially true, it is not false." *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016). Assessing substantial truth requires more than merely asking whether one statement plucked from a lengthy article is true or false. Instead, "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). An allegedly defamatory article is substantially true if its "gist" is correct, regardless of whether it "err[s] in the details." *Tatum*, 554 S.W.3d at 629 (quoting *Neely v. Wilson*, 418 S.W.3d 52, 63–64 (Tex. 2013)). In other words, a news article "with specific statements that err in the details but that correctly convey the gist of a [true] story is substantially true" and therefore not actionable. *Neely*, 418 S.W.3d at 63–64.

Identifying the gist of an allegedly defamatory publication is a question of law for the court. *See Turner*, 38 S.W.3d at 114 ("Whether a publication is capable of a defamatory meaning is initially a question for the court."). Courts determine an article's "gist or meaning by examining how a person of ordinary intelligence would view it." *Neely*, 418 S.W.3d at 64. This inquiry is objective and asks how a "hypothetical

9

reasonable reader" would understand the article, not how any particular reader actually understood it. *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004). With respect to spoken defamation, also called slander, we have described the "hypothetical reasonable reader" test as the "average listener" standard. *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990).

## III.

Coleman's allegation of falsity focuses on the article's statement that Coleman "assisted with the prosecution of Michael Morton." To demonstrate the statement's falsity, Coleman averred that he was not a licensed lawyer when Morton was convicted in 1987; that he was only a prosecutor in the Williamson County DA's office from 2008 to 2012; and that, while there, he never appeared as counsel, signed court filings, discussed case strategy, argued in court, or gave any public statements or interviews in the Morton case.

At the outset, we note that two different phases of the Michael Morton "case"—separated by roughly 25 years—are at issue here: (1) the initial prosecution and conviction in the mid-1980s, and (2) the post-conviction proceedings in 2010–11 that precipitated Morton's exoneration. Coleman argues that the challenged statement misrepresents his involvement as to *both* phases of the case, which we address in turn.

## A.

Coleman's principal complaint concerns the earlier phase of the Morton case. In his view, the article falsely communicates that he

10

participated in the notoriously flawed initial prosecution and conviction of Morton in the 1980s.

We begin, therefore, by asking what a reasonable reader would understand the article, as a whole, to convey about Coleman's involvement in Morton's initial prosecution and conviction in the 1980s. The answer is nothing. For the following reasons, the gist of the article does not communicate to the reasonable reader that Coleman participated in the initial prosecution of Michael Morton in the 1980s.

The entirety of the article recounts the 25-year history of the Michael Morton "case." Absent from the article is any sense of the procedural distinction between the "prosecution" phase and the "post-conviction" phase of Michael Morton's decades-long "case." The article is written from a non-lawyer perspective that does not approach the story in terms of the distinction between these two procedural postures and, instead, simply sees one long, sad Michael Morton "case." This is an eminently reasonable perspective, although a legally imprecise one.[2] Indeed, even lawyers keenly aware of the procedural distinctions might colloquially call the entire episode—from arrest, to conviction, to exoneration, to remuneration—"the Michael Morton case."

---

[2] Unlike the article, the correction published by the *Enterprise* acknowledges the procedural distinction between prosecution and post-conviction proceedings and therefore the technical inaccuracy of the article's use of the word "prosecution": "The proceedings that took place between 2005 and 2011 should not have been referred to as 'prosecution.' We regret the error." While the *Enterprise*'s decision to publish the correction may amount to the paper's admission that its story "erred in the details," such a correction is not an admission that the article lacked substantial truth. *See Tatum*, 554 S.W.3d at 629 (distinguishing between a publication that is not substantially true and a publication that merely "err[s] in the details").

11

In these colloquial terms—terms surely more familiar to the ordinary reader than criminal-procedure terminology—one side in the decades-long "case" is Morton, and the other side of the "case" is the Williamson County prosecutors, i.e., the "prosecution."

When referencing the entire history of the Morton "case," many reasonable non-lawyers—and even some lawyers—might very well refer to the Williamson County DA's decades-long effort to put Morton in prison and keep him there as the "prosecution" of Michael Morton. Again, the author appears to have employed the legal terms "prosecution" and "case" in this imprecise but not unreasonable way. Nothing in the article suggests to the reasonable reader that, in the article's re-telling of the case's entire history, a procedural distinction is contemplated between the 1980s "prosecution" and the 2010–11 post-conviction proceedings. Because the article gives no indication that it is speaking with this procedural distinction in mind, its statement that Coleman "assisted with the prosecution of Michael Morton" does not convey to the reasonable reader that Coleman assisted in *any particular aspect* of the 25-year effort by Williamson County prosecutors to obtain and maintain Morton's imprisonment.

The article thus treats the entire regrettable Morton episode as one "case," in which anyone who participated on the Williamson County side "assisted with the prosecution" of Michael Morton. The reasonable reader who is unfamiliar with the procedural distinctions would have no reason to assume from what the article says about Coleman that he was involved in the initial prosecutorial misconduct in the 1980s. The only detail of Coleman's "assistance" recounted in the article is his snide

12

courtroom comment in 2011, a detail which gives the reader no reason to assume that Coleman *also* participated 25 years earlier in the long-past history of the case.

Of course, many reasonable readers *are* familiar with the relevant procedural distinctions.[3] Such readers would pick up on, as do we, the non-lawyer author's conflation of the various procedural phases of the Morton saga. The only detail provided about Coleman's "assistance" is his mocking statement during the post-conviction proceedings 25 years later, and nothing in the article suggests he had any earlier involvement in the case—other than, perhaps, the disputed word "prosecution." But even the reasonable reader who understands the procedural significance of that word would not necessarily assume that the author of this news article is using the word in a legally precise sense. In fact, anyone who appreciates lawyerly precision has probably read plenty of news stories about legal affairs that gloss over lawyerly distinctions or contain inadvertent mischaracterizations of legal or procedural concepts. These journalistic imprecisions are not to be applauded, and they certainly can mislead the average reader in some cases. But errors of law by those reporting on the law are not automatically actionable as defamation. If it were otherwise, the "freedom . . . of the press" would be hard-pressed indeed. *See* U.S. CONST. amend. I (protecting the "freedom . . . of the press").

---

[3] We need not labor over whether the hypothetical reasonable reader thinks in terms of these procedural distinctions, because neither the reasonable reader who does think in those terms nor the reasonable reader who does not would understand this article to allege that Coleman participated in the initial prosecution of Morton in the 1980s.

As always, the question is whether the gist of the article, as a whole, communicates defamatory falsehoods about the plaintiff to the reasonable reader. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). Here, a reader who is sensitive to the procedural distinctions with which Coleman is concerned would be the first to understand that the article itself is not concerned with those distinctions. In fact, the more procedurally sensitive reader would be the most likely to understand the lengthy procedural timeline—under which Coleman's courtroom comments came 25 years after Morton's conviction—and would therefore be very unlikely to assume from Coleman's involvement in 2011 that he was also involved in the 1980s.

In sum, a reasonable reader of the entire article would not gather from the article's statement that Coleman "assisted with the prosecution" that he was involved in any particular aspect of the Michael Morton "case" during any particular time. Instead, viewing the article as a whole, the report that Coleman mocked the exonerating evidence in the courtroom while he was employed by the DA's office is the specific factual detail the article provides to support its general statement that Coleman "assisted with the prosecution." The article does not convey to the reasonable reader that Coleman participated in some other, earlier aspects of the Morton prosecution. Rather, its gist is that Coleman's "assist[ance] with the prosecution of Michael Morton" *was* his "mocking" and "demeaning" courtroom support for his office's post-conviction efforts to refuse DNA testing. Because the gist of the article as a whole does not convey the impression that Coleman worked as a prosecutor in

14

the initial stages of the Morton case in the 1980s, the article is not false in that regard.

## B.

Coleman nevertheless contends that, even if we restrict the timeframe to the 2010–11 post-conviction proceedings, the article's claim that he "assisted" with those proceedings is actionably false. He maintains that he never appeared as counsel, signed court filings, discussed case strategy, argued in court, or gave any public statements or interviews in Morton's post-conviction proceedings. He does not deny, at least at this stage, that he made light of the "bloody bandana" audibly in the courtroom in a mocking and demeaning way during those very post-conviction proceedings.

As with his argument about the word "prosecution," Coleman's argument about the 2010–11 post-conviction proceedings hinges on a rather technical understanding of what it means for a lawyer to "assist" in his office's courtroom efforts. Even if Coleman did not provide *formal* support *as a lawyer* for his office's efforts to keep Morton behind bars, he does not contest that he provided *moral* support in a public way *in the courtroom*. The unflattering and uncontested account of his courtroom statements provides the factual support for the gist of what the article claims about Coleman—that he "assisted," in a regrettable way, in the 2010–11 phase of the Michael Morton case as a Williamson County prosecutor.

As explained above, the gist of this article—at least with respect to Coleman's involvement in the Morton case—is that Coleman "assisted with the prosecution" of Morton *by* publicly mocking Morton's key

15

evidence in a courtroom in 2011. For purposes of this TCPA appeal, Coleman does not dispute the key fact—his demeaning statements in the courtroom. He instead disputes the article's characterization of that fact as "assistance" in the "prosecution." We are not convinced. A reasonable reader—whether sensitive or not to the lawyerly distinctions on which Coleman's arguments rely—would not come away from reading the entire article with a false impression of Coleman's connection to the post-conviction phase of the Morton case. The gist of the article as a whole conveys to the reader the uncontested fact that Coleman "assisted" the "prosecution" by mocking the exonerating evidence in the courtroom. The article conveys no further details or allegations about Coleman's involvement in the post-conviction phase of the case. Thus, in the context of the article as a whole, the broad statement that Coleman "assisted with the prosecution" does not convey false information about Coleman's involvement in the post-conviction phase of the proceedings.

## C.

Finally, even if we agreed with Coleman that the article conveys falsehoods about his involvement in Morton's post-conviction proceedings, we would still need to ask "whether the alleged defamatory statement was more damaging to [Coleman's] reputation, in the mind of the average [reader], than a truthful statement would have been." *McIlvain*, 794 S.W.2d at 16. Assuming the challenged statement falsely characterizes Coleman's involvement in the post-conviction proceedings, a precisely true version (as an author like Reddell might put it) would be something like: "Coleman publicly supported his office's decades-long

16

efforts to keep an innocent man behind bars by audibly mocking—in the courtroom—Michael Morton's requests for DNA testing of the very piece of evidence that would ultimately exonerate Morton after 25 years of wrongful imprisonment."

Nothing in the *Enterprise* article would be more damaging to Coleman's reputation, in the eyes of the average reader, than this undisputedly true[4] account of Coleman's participation in Morton's post-conviction proceedings. For this additional reason, the article's statement that Coleman "assisted with the prosecution" of Morton is not actionable, as a matter of law, with respect to Coleman's involvement in Morton's post-conviction proceedings. *See Toledo*, 492 S.W.3d at 714.

## IV.

For these reasons, Coleman's claims should have been dismissed pursuant to the TCPA. The judgment of the court of appeals is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

James D. Blacklock
Justice

**OPINION DELIVERED:** February 16, 2024

---

[4] The factual question of whether and how Coleman made these controversial courtroom comments is not before this Court. Coleman does not dispute in this Court that he did so, but our decision in this TCPA appeal should not be construed to resolve any factual questions regarding the episode.

17